UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                               :

AMBROZINE JEFFREY,              :

                   Plaintiff,   :

                               :

         -v-                   :

                               :

MONTEFIORE MEDICAL CENTER,   :

                 Defendant.  :

                               :
----------------------------------------------------------X

No. 11 Civ. 6400 (RA)

OPINION AND ORDER

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 27 2013

RONNIE ABRAMS, United States District Judge:

Plaintiff Ambrozine Jeffrey brings this action against Defendant Montefiore Medical Center ("Montefiore") alleging religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), the New York State Human Rights Law, Exec. L. § 290, et seq. ("NYSHRL") and the New York City Human Rights Law, Admin. Code § 8-101, et seq. ("NYCHRL"). Before the Court is Montefiore's motion for summary judgment. For the reasons stated below, the motion is granted with respect to Plaintiff's failure-to-accommodate claims and denied with respect to her disparate treatment and retaliation claims.

## BACKGROUND[1]

### The Parties

Montefiore is a comprehensive, non-profit medical center in Bronx, New York. (Def.'s 56.1 ¶ 1; Williamson Decl. ¶ 5.) As an equal opportunity employer, Montefiore acknowledges

---

[1] The following facts, uncontroverted unless otherwise noted, derive from Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute ("Def.'s 56.1"), Plaintiff's Counterstatement of Disputed Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") and from the evidence submitted in connection with this motion.

that accommodation in scheduling and employment conditions may be required to assure the implementation of its policy of equal employment and its policy against discrimination, harassment and retaliation.  (Def.'s 56.1 ¶¶ 2-3; Williamson Decl. ¶¶ 6-8; Williamson Tr. 76-77.)

Plaintiff has been a devout practicing Seventh-day Adventist since the age of thirteen and holds the belief that "Saturday, is to be kept holy from Sunset Friday to Sunset Saturday, which is commonly referred to as the Sabbath."  (Jeffrey Decl. ¶¶ 3-4.)  Her religious beliefs and practices thus "forbid [her] from engaging in any . . . kind of secular work during the Sabbath." (Id.)

### Plaintiff Applies for Employment as a Licensed Practical Nurse at Montefiore

Plaintiff received a nursing degree from the College of New Rochelle in 2006.  (Def.'s 56.1 ¶ 5; Jeffrey Tr. 27-28.)  She subsequently took the National Council Licensure Examination ("NCLEX"), the passage of which is required to become a Registered Nurse ("RN").  (Def.'s 56.1 ¶ 6.)  Plaintiff did not pass the NCLEX, however, and therefore could not begin work as an RN.  (Id. ¶ 8.)

In 2007, Plaintiff's cousin, a doctor at Montefiore, suggested that Plaintiff apply to work there as a Licensed Practical Nurse ("LPN").  (Jeffrey Decl. ¶ 5; Williamson Tr. 51.)  LPNs must be licensed, but are not required to hold a nursing degree or to have passed the NCLEX.  (Def.'s 56.1 ¶ 9.)  They report to RNs, and their responsibilities include administering medication, collecting data from patients and documenting patient care.  (Def.'s 56.1 ¶¶ 19-20.)  AN LPN cannot, however, "assess" patients or perform other tasks RNs can perform.  (Id. ¶ 22.)[2]

On September 25, 2007, Plaintiff applied for an LPN position at Montefiore.  (Jeffrey

---

[2]      While an LPN can carry out treatment, intervention and plans of care established by an RN, RNs are responsible for complete oversight of the patient populations to which they are assigned, which oversight includes developing goals of treatment, plans of care and ongoing patient assessment.  (Williamson Tr. 134.)  As Plaintiff described the distinction, an LPN "would pretty much go in and ask if the patient is in pain, et cetera" whereas an RN "would go use a scope, [and] listen to the breath[ing] sounds."  (Jeffrey Tr. 215-16.)

Decl. ¶¶ 5-6, Ex. A.)  Plaintiff's application stated that her "Acceptable Working Days" were "Sunday–Thursday" but did not specify that her religious beliefs prevented her from working on the Sabbath.  (Id. Ex. A.)

Prior to her hire, Plaintiff met with Leslyn Eva Williamson, who was at the time an administrative nurse manager ("ANM") at Montefiore.  (Def.'s 56.1 ¶ 38; Williamson Decl. ¶ 21.)  Plaintiff did not inform Williamson of her need for religious accommodation at the meeting.  (Jeffrey Tr. 53, 59; Williamson Decl. ¶ 22.)

*Terms and Conditions of Employment for Montefiore LPNs*

The terms and conditions of employment for LPNs at Montefiore were governed in part by a collective bargaining agreement between 1199 SEIU United Healthcare Workers East ("1199") and League of Voluntary Hospitals and Homes of New York (the "1199 CBA"). (Def.'s 56.1 ¶¶ 10-11; Williamson Decl. ¶ 10.)  The 1199 CBA permitted Montefiore to schedule LPNs employed less than two years to work Saturday and Sunday of every weekend. (Williamson Decl. Ex. C.)  In most instances, however, Montefiore required only that LPNs work Saturday and Sunday of every other weekend.  (Def.'s 56.1 ¶ 14; Williamson Decl. ¶ 13.) To accommodate those LPNs who, for religious reasons, could not work on Saturday, Montefiore permitted them to work every Sunday (to the extent they were needed) in lieu of working every other complete weekend.  (Def.'s 56.1 ¶ 15; Williamson Decl. ¶ 14.)  Montefiore also permitted employees to clock out on Fridays in order that they have sufficient time to travel home before sundown as their religious beliefs required.  (Yasin Tr. 40-41, 85; Williamson Tr. 75-76.)

*Plaintiff Begins Work as an LPN*

Plaintiff began work as an LPN at Montefiore on or about December 3, 2007 and was

3

assigned to work in a unit called "Klau 4."   (Def.'s 56.1 ¶¶ 16-17.)   Plaintiff began working

under the supervision of Yvonne Butler, a Klau 4 charge nurse[3] and Williamson, the Klau 4

ANM.  (Jeffrey Decl. ¶ 9.)  Williamson was promoted to Director of Nursing in February 2008

and, in summer 2008, Mohamad Yasin became the acting ANM for Klau 4.  (Williamson Decl. ¶

20; Williamson Tr. 15; Yasin Tr. 33-34.)

At the outset of her employment, Plaintiff informed Butler and human resources

representatives that she could not work on Saturdays.  (Jeffrey Tr. 50-51, 56-57, 64-65; Butler

Tr. 23, 33-34; Williamson Decl. ¶ 22.)  In apparent response to this information, Butler did not

schedule Plaintiff to work on Friday or Saturday and instead scheduled Plaintiff to work the

Sundays she was needed.  (Def.'s 56.1 ¶¶ 43-44; Jeffrey Tr. 68-69; Butler Tr. 39.)  For instance,

in the first months of 2008, Plaintiff worked two Sundays in March, no Sundays in April, one

Sunday in May, three Sundays in June and one Sunday in July.  (Schmidt Decl. Ex. I.)

Throughout her entire employment at Montefiore, Plaintiff avers that she was "regularly

scheduled to work on Sundays," that it was "never an issue" and that she always "happily

obliged."  (Jeffrey Decl. ¶¶ 7, 10, 18, 48.)  The record reflects that Plaintiff did work Sundays

when she was scheduled to do so.  (Yasin Tr. 73-74.)  According to Plaintiff, she requested

Sunday off on only two occasions, once to undergo a surgical procedure and once to prepare to

retake the NCLEX.  (Jeffrey Decl. ¶ 7.)

It is undisputed, however, that at no point during Plaintiff's employment as an LPN did

she work on a Saturday.  (Def.'s 56.1 ¶¶ 43-44; Williamson Decl. ¶ 52.)  Plaintiff also testified

repeatedly that she was never disciplined for not working on a Saturday.  (Jeffrey Tr. 62, 87,

---

[3]     A charge nurse is tasked with supporting the ANM with staffing, mentoring new associates and otherwise
assisting with the day-to-day operation of the unit.  (Butler Tr. 14-15.)  As Plaintiff notes, Butler is also referred to
as an "AANM" (presumably, assistant administrative nurse manager) during this time.  (Jeffrey Decl. ¶ 9, Ex. D;
Pl.'s 56.1 ¶ 34(a).)  Any distinction between these titles is immaterial for purposes of this motion.

191-92.)

***Plaintiff Discusses Scheduling with Supervisors in Summer 2008***

In or about June or July 2008, Butler spoke to Yasin "about a scheduling problem where Ms. Jeffrey . . . was not working on . . . Saturdays, and was off on Sunday, and that the staff w[as] complaining." (Yasin Tr. 22-23; Williamson Tr. 102-04.)  In a subsequent meeting with Williamson in or about July 2007, Butler asked Williamson whether she was aware that Plaintiff did not work Saturdays.  (Def.'s 56.1 ¶ 50; Williamson Decl. ¶ 23.)  Williamson responded that she was not aware and instructed Butler to schedule Plaintiff to work weekends, including Saturdays, as per the 1199 CBA.  (Williamson Decl. ¶¶ 25-26; Butler Tr. 34.)

Butler subsequently informed Plaintiff, per Williamson's directive, that Plaintiff would need to be placed on the schedule every other weekend.  (Def.'s 56.1 ¶ 54; Jeffrey Tr. 64-65.)  When Plaintiff reminded Butler that she could not work on Saturdays, Butler suggested that Plaintiff speak directly with Williamson.  (Def.'s 56.1 ¶ 55; Jeffrey Tr. 65.)

Plaintiff met with Williamson in July 2008 and the two discussed, for the first time, Plaintiff's need for religious accommodation.  (Def.'s 56.1 ¶ 56; Williamson Decl. ¶ 27; Jeffrey Tr. 69.)  During the meeting, Williamson states that she "informed Plaintiff that she could have Saturdays off as a religious accommodation, but would have to work every Sunday she was needed in lieu of working every other full weekend."  (Williamson Decl. ¶ 27.)  Williamson's statement was consistent with accommodations Montefiore had provided to employees in the past "[o]nce an associate requests" an accommodation.  (Id.; Williamson Tr. 76; 105.)  Contrary to Plaintiff's statement that she "happily" agreed to work on Sundays as necessary, Williamson avers that, during their meeting, "Plaintiff would not agree to work on Sundays in order to have Saturdays off."  (Williamson Decl. ¶ 29.)

Plaintiff generally recalled the meeting differently, testifying that Williamson told Plaintiff she "ha[d] to" work every other weekend, including Saturdays, and that she would "be fired" if she did not because "there are other people in [Montefiore] that are Seven Day Adventist [sic] that she don't [sic] give the days and they are working, and [Plaintiff] cannot just come and get the day off."  (Jeffrey Tr. 70.)

On several other occasions in summer 2008, Plaintiff and Williamson spoke about her accommodation requests, during which Williamson again asked that Plaintiff agree to work on Sundays in lieu of Saturdays.  (Williamson Decl. ¶ 34; Jeffrey Tr. 80.)  Williamson avers that, because of Plaintiff's "prior resistance to accept this accommodation," Williamson asked that if Plaintiff were to agree to this arrangement, "she put it in writing."  (Williamson Decl. ¶ 34.) According to Williamson, Plaintiff continued to "refuse[] to agree to such an arrangement."  (Id.)

Plaintiff eventually submitted a letter to Williamson, dated July 21, 2008, from her church pastor indicating that she could not work "between sunset Friday and sunset Saturday." (Def.'s 56.1 ¶ 57; Jeffrey Tr. 76.)  The letter indicated that Plaintiff was "willing and available to work at any other time."  (Jeffrey Decl. Ex. A.)

Around this time, Plaintiff also met with Butler and Yasin to discuss Plaintiff's request not to work on Saturdays.  (Def.'s 56.1 ¶ 65.)  During this meeting, Yasin suggested that perhaps Plaintiff work on a per diem basis or seek reassignment to another unit that could accommodate Plaintiff's need to be off on Saturdays.  (Id. ¶ 66; Jeffrey Tr. 78.)  Plaintiff testified that Yasin was "very upset" about her pastor's letter, commenting to Plaintiff that "some pastor sen[t] a letter in here, and this is a big thing" and "mak[ing] it very clear" that he believed Plaintiff was "lying" and "deceiving" because she "did not tell anyone about the Sabbath."  (Jeffrey Tr. 77-78, 82.)

6

There was no resolution regarding Plaintiff's scheduling issues at the meeting, and Yasin informed Plaintiff that she would be scheduled every other weekend, and would be put on the schedule for Saturday, August 9, 2008.  (Def.'s 56.1 ¶¶ 67-69.)  He soon after added Plaintiff to the work schedule for Saturday, August 9, 2008 and Sunday, August 10, 2008.  (Id. ¶ 67; Jeffrey Tr. 79-80; Yasin Tr. 66-67.)  Plaintiff states that she was also scheduled to work on Saturday, August 23, 2008.  (Jeffrey Decl. ¶ 18.)

An August 6, 2008 memorandum from Butler reflects a subsequent exchange regarding Yasin's scheduling of Plaintiff on the calendar for Saturday, August 9, 2008.  It states:

> Ms. Jeffrey was reminded that she is scheduled to work every other weekend starting August 9, 2008.  She first stated, "is this what you call to talk about.  Mr. Mohamed Yasin and Yvonne [Butler] spoke to me already.  She further stated, "I am going to be honest with you I won't be coming on Saturday, and even if I come I would not be able to function.  I would not punch in because, I wouldn't accept pay for that day, I'd rather volunteer . . . This is my religious belief and I have been practicing since I was thirteen."
>
> Ms. Jeffrey was reinstructed to report to work as schedule[d] and that failure to do so will result in disciplinary action.  Ms. Jeffrey responded by stating . . . ["]You all are stressing me out.["]

(Id. Ex. D.)

### *Plaintiff Contacts Her Union Representative*

Plaintiff contacted her union office.  (Id. ¶ 18.)  Initially unresponsive, Plaintiff eventually spoke "very briefly" with a representative who told her the union could not "get involved . . . with discrimination claims" and that Plaintiff "needed to resolve the issue with [her] Unit, or through [Montefiore's] HR."  (Id.)  An undated document, produced by Plaintiff and bearing her signature, appears to commemorate this conversation with her union, stating in full:

> I then try to contact the Union with no respond [sic].  I was referred to the Union rep. [] Rubby whom I spoke with on 8/6/2008 and she contacted Mrs. Eva [Williamson] who stated to her that I have to work on Saturday if I don't work she will fire me.

(Gurtman Decl. Ex. D.)

Montefiore contests Plaintiff's account, submitting a declaration from Plaintiff's 1199 union delegate, Ruby Graham-Joseph (presumably the "rep." identified as "Rubby" in the above-quoted document).  Graham-Joseph's Declaration states:

> In or about the summer of 2008, Ambrozine Jeffrey came to me, as her Union delegate, to complain that Montefiore was not willing to accommodate her request to have off every weekend.  Ms. Jeffrey informed me that Montefiore was willing to give her Saturdays off, but she also needed Sundays off, which Montefiore would not grant to her.  Ms. Jeffrey asked that I write a grievance on her behalf.  I explained to Ms. Jeffrey that the union contract allowed Montefiore to schedule her every weekend, and I could not assist her with obtaining an accommodation as a union representative if she was not willing to work Sundays.
> . . .
> As a union representative, I have previously assisted other Seventh-Day Adventists at Montefiore obtain religious accommodations to observe their Sabbath.  Montefiore has always been willing to grant a religious accommodation if the employee is willing to work on Sundays.
> . . .
> After my conversation with Ms. Jeffrey, I spoke to [Williamson] regarding my conversation with Ms. Jeffrey. . . . I told Ms. Williamson that, in light of Ms. Jeffrey's request to have off both Saturday and Sunday, the Union would not intervene on her behalf, because her refusal to work on Sundays was unreasonable.

(Graham-Joseph Decl. ¶¶ 6-9; 11, 14, 18 (formatting altered).)   Williamson confirms that Graham-Joseph relayed to her the conversation with Plaintiff.  (Williamson Decl. ¶¶ 30-33.)

***Plaintiff Does Not Work on Saturday, August 9, 2008***

On Friday, August 8, 2008, Plaintiff advised Yasin that she would not work the following day "on account of [her] Sabbath Observance."  (Jeffrey Decl. ¶ 19.)  She did not work on August 9, 2008 and received no pay for that day.  (Id.; Jeffrey Tr. 86.)

Following Plaintiff's absence, Yasin requested a meeting with Plaintiff and HR, the purpose of which, according to Yasin was "[t]o get help" regarding Plaintiff's accommodation request.  (Yasin Tr. 24.)  Plaintiff contends, instead, that Yasin sought to "discipline[]" her.

(Jeffrey Decl. ¶ 17.)  She cites to an August 11, 2008 email from Yasin to a Montefiore HR representative stating that:

> [Plaintiff] was absent on 8/9.  This is after we met with her on 8/6 and advised her of expectations that she come to work on 8/9 as scheduled including discussion of the consequences of failure to come to work.  We are asking her to bring a [union] delegate re: absence and need to include you as well.

(Id. Ex. D.)  Plaintiff further testified that Butler called her on Monday, August 11, 2008 to "reprimand" her for "not showing up to work on Sabbath" and to advise her to bring her union delegate to the meeting at which "there [would] . . . disciplinary action taken for not showing up to work on Saturday."  (Id. ¶ 21; Jeffrey Tr. 134).  The meeting, however, was never held. (Yasin Tr. 25.)

***Plaintiff Works on Sunday, August 10, 2008***

On Sunday, August 10, 2008, Plaintiff "showed up to work as scheduled."  (Jeffrey Decl. ¶ 20.)  Upon arrival, she was reassigned by the Klau 4 charge nurse, pursuant to an order from "higher ups," to another floor of the hospital that Plaintiff was not "familiar with."  (Id.)

Plaintiff eventually learned she was assigned to the different floor because that floor was "short staffed."  (Jeffrey Tr. 88-89.)  LPNs, as well as other nursing staff, often "floated" to other units to accommodate the hospital's staffing needs, consistent with Montefiore's policies and practices.  (Def.'s 56.1 ¶ 76; Williamson Decl. ¶ 15.)  Plaintiff acknowledged that she had, in the past, occasionally floated to various other units to perform LPN work when those units were short-staffed.  (Jeffrey Tr. 34-35.)

Although Plaintiff testified that she worked the same hours on August 10, 2008, and was paid the same for her work that day, (id. 89), she claims her duties at the reassigned unit amounted to the "work of a Nurse's Aide," a "less distinguished" position with "less meaningful tasks."  (Jeffrey Decl. ¶ 20.)

9

Plaintiff's assignment on August 10, given to her by the charge nurse on the temporary floor (i.e., not the Klau 4 charge nurse), was "extremely hard" and "[v]ery rough"—"one of [the] hardest [she] ever experienced in Montefiore." (Jeffrey Tr. 88, 90, 93; Def.'s 56.1 ¶ 77.) For instance, as Plaintiff explained, charge nurses "normally don't give you a vent and a trach with so much fingerstick [blood collection] at one time" but instead "will break it up [and] [m]ake it a little simpler for you." (Jeffrey Tr. 90.) Plaintiff testified that she had never received such an assignment at Montefiore: "a trach, a vent, all lumped together in one assignment. Ten patients, no." (Id. 91.) Plaintiff complained that these tasks were "unfair" but was told by the charge nurse that Plaintiff "had to" perform them because the unit was "short staffed." (Id. 88, 91; Def.'s 56.1 ¶ 79.)

One of the patients assigned to Plaintiff was "pretty much over 300 pounds." (Jeffrey Tr. 88, 93; Jeffrey Decl. ¶ 20.) While Plaintiff and two nurse's assistants were lifting this patient—a typical LPN responsibility that Plaintiff had performed on other occasions—Plaintiff "hear[d] a crack in [her] back" and was "in excruciating pain." (Jeffrey Tr. 93-95.)

**_Plaintiff Takes a Leave of Absence_**

On or about August 12, 2008, Plaintiff requested, and was granted, a medical leave of absence as a result of her back injury. (Jeffrey Tr. 109; Jeffrey Decl. ¶ 20.)

While on medical leave, in November 2008, Plaintiff took and passed the NCLEX on her third try. (Def.'s 56.1 ¶ 89.)[4] She was issued an RN license on December 22, 2008. (Jeffrey Tr. 162.)

Around this time, still on leave, Plaintiff contacted Williamson to inform her that she had passed the NCLEX and to discuss the possibility of returning to Montefiore as an RN. (Jeffrey

---

[4]     Plaintiff failed the NCLEX a second time in April 2008. (Jeffrey Decl. ¶ 22.)

Tr. 127, 138; Williamson Decl. ¶ 36.)  Plaintiff testified that Williamson informed her that she would "have to come back . . . to [her] old job and then apply before [she] could get the RN position."  (Jeffrey Tr. 138.)[5]  Williamson also told Plaintiff that they "had some unfinished business that [they] need[ed] to also address upon her [re]turn," referring to a "commitment letter" stating that Plaintiff would work on Sundays.  (Williamson Tr. 125-26.)

Plaintiff was cleared to return to work at Montefiore in early January 2009.  (Def.'s 56.1 ¶¶ 86-88; Jeffrey Tr. 145.)  Around this time, Plaintiff contacted a nurse recruiter who confirmed that there was an open RN position at Montefiore.  (Jeffrey Decl. ¶ 24.)  Plaintiff was interviewed, passed Montefiore's in-house tests and filled out the appropriate paperwork.  (Id.)

*Plaintiff Returns from Leave*

On January 5, 2009, Plaintiff met with Williamson to further discuss her interest in transferring to an RN position and also to discuss her religious accommodation request.  (Jeffrey Tr. 148-49; Williamson Decl. ¶ 38.)  Plaintiff testified that she and Williamson had the following exchange:

> We discussed the issue with the Sabbath.  This was when Eva [Williamson] literally curse[d] at me.  Eva can be very, very, very vicious.  Eva literally curse[d] at me.  She was very angry because in her word[s], she said that I'm causing too much issue [sic] with my God damn Sabbath . . . She said, I can't give you the damn Sabbath.  The job is yours, but not the Sabbath.  And she went on to tell me that she's a bitch and she's going to F me up.
>
> I said to her, how are you going to do that[?]  I cross all my Ts, I dot all my Is; how are you going to do that[?]
>
> She said watch me.  Give me a minute to go in the computer.  I will find something on you.  I will find something on you.  You see, you don't know who you are dealing with, I'm a bitch.
>
> And I pause[d] and I gently said, Eva, all I'm asking for is the day off on the Sabbath.  I don't care what other days you put me.  I said, remember, I've been

---

[5]     Williamson's slightly different recollection is that she told Plaintiff that "she would have to be medically cleared to return to work prior to being considered for a transfer."  (Williamson Decl. ¶ 37.)

working on Sunday.  Yvonne [Butler] [is] telling me I am coming too much Sundays if I want time off, and she reshuffle [sic] the schedule and said I could come once a month on a Sunday.  I said I have no problem coming in on a Sunday.  I have no problem, because I just believe it's fair for me to come in on a Sunday, if I'm not coming in on Saturday.

And she paused and . . . she said, well, put it in writing.

I said, but I've been doing this.  If you want it in writing, it's no issue.  I give it to her in writing.  Get it notarized, and I give it to her in writing.

(Jeffrey Tr. 149-150.)  Williamson acknowledges that she informed Plaintiff that she would be accommodated "with every Saturday off if she were to agree to work every Sunday she was needed" and "again requested that if she were to accept this accommodation, she put her agreement in writing."  (Williamson Decl. ¶ 39.)

Plaintiff avers that when Williamson "refused" to add her to the schedule on January 5, 2009, Plaintiff called Montefiore's HR department to report "discriminatory and harassing conduct."  (Jeffrey Decl. ¶ 26.)  An HR representative responded that Plaintiff would need to "resolve [her] religious accommodation issue within [her] Unit" but that it would follow up with Williamson "to get her side of the story."  (Id.)

Shortly thereafter, Williamson contacted Plaintiff to register "displeasure that [Plaintiff] reached out to HR" and to ask Plaintiff to meet with her on January 12, 2009 and to bring a "signed statement agreeing to work every Sunday, in lieu of Saturdays."  (Id. ¶ 27.)

Plaintiff ultimately submitted a letter to Williamson on January 12, 2009 memorializing her agreement "to work every Sundays [sic] as previously discussed in order to be off on Saturdays (Sabbath) for religious reasons."  (Id. ¶ 28, Ex. F; Williamson Decl. ¶ 40.) Williamson "demand[ed]" that Plaintiff notarize the letter and "attacked" Plaintiff, telling her she "was making a big issue with [her] 'God d--- Sabbath' and threaten[ing] to 'F--- [Plaintiff] up', amongst other vicious statements."  (Jeffrey Decl. ¶¶ 28-29.)  Plaintiff had the letter notarized on

12

January 14, 2009.  (Id. ¶ 28.)

Plaintiff returned to work as an LPN at Montefiore on January 12, 2009.  (Def.'s 56.1 ¶ 97; Williamson Decl. ¶ 41.)   She was not scheduled to work any Saturdays after that date. (Jeffrey Tr. 182-83.)  She continued to work as an LPN until she was hired into an RN position. (Def.'s 56.1 ¶ 98.)

***Plaintiff Transitions from an LPN to an RN Role***

In or about January 2009, Williamson approved Plaintiff's hiring into an open RN position, and on February 19, 2009 she was hired with a scheduled start date of March 2, 2009. (Jeffrey Decl. Ex. G; Williamson Decl. ¶¶ 42-43.)

Several aspects of the RN position differed from those of the LPN position.  See generally supra note 2.  As is relevant for purposes of this motion, an RN must complete documentation that an LPN is not permitted to complete.  (Def.'s 56.1 ¶¶ 106-107.)  For example, an LPN cannot document patient assessment, which must be documented by an RN. (Id. ¶ 108.)  Failure to thoroughly and accurately complete documentation may put a patient at risk and expose Montefiore to liability.  (Id. ¶ 158.)

Separately, Montefiore RNs were not subject to the 1199 CBA, but rather to an agreement between the hospital and the New York State Nurses Association.  ("NYSNA CBA"). (Id. ¶ 109; Williamson Decl. ¶ 17.)  The NYSNA CBA required that newly-hired RNs undergo a four-month probationary period, during which the RN is subject to demotion, suspension, other discipline or discharge without recourse to the grievance process.  (Def.'s 56.1 ¶ 110; Williamson Decl. ¶ 18.)

New RNs are required to complete an orientation program consisting of one week of classroom and computer training, followed by several weeks of training in their assigned unit

with a preceptor, an experienced RN that trains new RNs.  (Def.'s 56.1 ¶ 123; Jeffrey Decl. ¶ 31; Williamson Decl. ¶ 46.)  Preceptors are responsible for orienting their preceptees, ensuring they comply with Montefiore's clinical policies and procedures, monitoring and documenting their progress and reporting issues, if any, to the ANM.  (Def.'s 56.1 ¶ 124; Williamson Decl. ¶ 46.)

At Williamson's direction, Plaintiff was assigned to a different unit—"Northwest 8"—for her orientation.  (Def.'s 56.1 ¶ 125; Williamson Decl. ¶ 47; Williamson Tr. 158.)  Although Williamson informed Tita Aguilar-Niere, the Northwest 8 ANM, that Plaintiff would be orienting on her unit, she forgot to mention Plaintiff's religion or need for accommodation. (Def.'s 56.1 ¶¶ 131, 133-34; Aguilar Decl. ¶ 4; Williamson Decl. ¶ 48.)  Therefore, at the time Plaintiff was assigned to Northwest 8, Aguilar "did not know anything about [Plaintiff's] religion, prior requests for religious accommodations, or any prior complaints made by [Plaintiff] related to her religion or religious accommodations."  (Aguilar Decl. ¶ 6.)  In fact, Aguilar could only generally recall that that Plaintiff had previously worked as an LPN at Montefiore and had no recollection of ever having interacted with her.  (Id. ¶ 6.)

Williamson avers that she had no other basis to assign Plaintiff to Aguilar's unit than to ensure that Plaintiff and other RN orientees were evenly distributed to various units. (Williamson Tr. 191-92; Williamson Decl. ¶ 47.)

Plaintiff, however, was in "great distress" to be assigned to Aguilar due to "past issues" between them.  (Jeffrey Decl. ¶¶ 32-33.)[6]  Plaintiff claims Williamson and Yasin were aware of these issues and that Williamson assigned her to Aguilar so Aguilar could "hatchet" her.  (Jeffrey

---

[6]      One such issue occurred when Plaintiff was temporarily assigned to Aguilar's unit as an LPN in 2008. (Aguilar Decl. ¶ 5.)  At that time, Plaintiff was assigned to float on Aguilar's floor and failed to respond to a patient's call bell.  According to Plaintiff, Aguilar yelled and was disrespectful, but later apologized.  (56.1 ¶ 135; Jeffrey Tr. 170-71.)  Despite that Aguilar disclaimed any recollection of having interacted with Plaintiff, Plaintiff claims Aguilar "reminded [Plaintiff]" of this incident "when [she] started orientation on [Aguilar's] floor."  (Jeffrey Tr. 171.)

14

Tr. 170.)  Although there is no evidence Yasin played a role in assigning Plaintiff to Aguilar's unit, Plaintiff claims to have "begged and pleaded" with Yasin not to assign her to Aguilar. (Jeffrey Decl. ¶ 32.)  Yasin allegedly responded by telling Plaintiff that he was "going to keep an eye on [her] during [her] [o]rientation" and that she had "better stop rocking the boat, or [she could] be terminated at will[] during [her] RN Probationary Period with no questions asked." (Id. ¶¶ 32, 34.)

On March 9, 2009, after a week of classroom instruction, Plaintiff, "[f]earful for [her] job security," met with Aguilar to discuss her schedule and preceptor assignment.  (Def.'s 56.1 ¶ 137; Pl.'s 56.1 ¶ 137(a); Jeffrey Decl. ¶ 33; Aguilar Decl. ¶ 9.)  Aguilar informed Plaintiff that Amy Lizaso-Belir—"an experienced and patient RN who had previously precepted other new RNs at Montefiore"—would be her preceptor and that Plaintiff's schedule would be matched with hers.  (Aguilar Decl. ¶¶ 7, 10; Jeffrey Decl. ¶ 33.)  At the time Plaintiff was assigned to orient on Northwest 8, one other RN, Elise Laryea, was also orienting on Northwest 8.  (Def.'s 56.1 ¶ 127.)

Plaintiff told Aguilar that she could not work on Saturday.  (Jeffrey Decl. ¶ 33; Aguilar Decl. ¶ 11; Aguilar Tr. 14; Williamson Tr. 158.)[7]  Aguilar testified that Plaintiff initially took the position that "she [did]n't want to work on Saturdays and Sundays" but then said "I'm willing to work on Sunday just don't give me a Saturday."  (Aguilar Tr. 85-86.)  Aguilar told Plaintiff that she had to work when Lizaso-Belir worked, which included Saturdays, and if she refused she would not be permitted to work on Aguilar's floor.  (Jeffrey Tr. 167-68; Jeffrey Decl. ¶ 33.)

---

[7]      Plaintiff claims to have first told Aguilar that she observed the Sabbath on Friday, March 6, 2009. Specifically, Plaintiff states that sometime after 5:00 p.m. on Friday, March 6, 2009, Aguilar asked Plaintiff to speak with her to which Plaintiff responded that she "had already punched out, and due to [her] Sabbath Observance, as the Sunset was approaching, . . . needed to leave." (Jeffrey Decl. ¶ 31.)  Aguilar responded by telling Plaintiff she would be "reporting [her] to Mr. Yasin and Ms. Williamson." (Id.)  Aguilar does not recall this conversation. (Aguilar Decl. ¶ 6.)

Plaintiff advised Aguilar of her arrangement with Williamson, (Jeffrey Tr. 167-68), and Aguilar "immediately" called Williamson to confirm the arrangement.  (Aguilar Decl. ¶ 12; Williamson Tr. 158-59.)  Williamson indeed confirmed Plaintiff's accommodation and told Aguilar not to schedule her to work Saturdays.  (Aguilar Decl. ¶ 12; Williamson Decl. ¶ 50.)  At that point, Aguilar rewrote Plaintiff's schedule so she was not assigned to work on Saturdays, and a second preceptor was assigned to Plaintiff during Lizaso-Belir's days off.  (Aguilar Decl. ¶ 13; Aguilar Tr. 13; Jeffrey Decl. ¶ 34.)[8]

Williamson subsequently spoke with Plaintiff, apologized, and "assured her that she would not be scheduled to work on Saturdays."  (Williamson Decl. ¶ 51; Williamson Tr. 158-59, 162.)  Plaintiff also spoke to Yasin who again admonished her for "rock[ing] the boat."  (Jeffrey Tr. 168.)

After Aguilar met with Plaintiff about her schedule, she informed Lizaso-Belir that she would be precepting Plaintiff, but made no mention of Plaintiff's religion or need for accommodation.  (Aguilar Decl. ¶¶ 21-22.)

***Plaintiff's Supervisors Review Her Performance During Orientation***

Plaintiff and Lizaso-Belir, who did not know each other prior to Plaintiff's orientation, met throughout the day and at the end of each day.  (Lizaso-Belir Decl. ¶¶ 5, 13; Jeffrey Tr. 205-06.)

During these meetings, Lizaso-Belir would, inter alia, review Plaintiff's documentation and provide Plaintiff with verbal feedback.  (Lizaso-Belir Decl. ¶ 13; Def.'s 56.1 ¶ 172.) Plaintiff testified that Lizaso-Belir commented that her documentation was "good" and that, during her first three weeks of orientation, Plaintiff was "always told" that she was "doing a

---

[8]      Plaintiff nonetheless claims that Aguilar "emphasized . . . that in future [s]chedules, [Plaintiff] would be placed to work the same [s]chedule as that of [Lizaso-Belir]."  (Jeffrey Decl. ¶ 34.)

good job" and "progressing nicely." (Jeffrey Tr. 255-56; Jeffrey Decl. ¶ 36.) Indeed, Lizaso-Belir "increased [Plaintiff's] [p]atient load" and her "patient care responsibilities." (Jeffrey Decl. ¶ 36.)

According to Lizaso-Belir, however, Plaintiff "struggled with her documentation"— which was "vague," "not specific to the patient," and "failed to capture the reasons why the patient was being hospitalized and the steps necessary to care for the patient"— and "was unable to properly complete the documentation on her own" despite repeated instruction and extensive guidance. (Lizaso-Belir Decl. ¶¶ 11-13, 15, 24; Lizaso-Belir Tr. 62.) Documentation is something "an RN who had passed her boards and completed nursing school . . . should have been able to properly . . . complete." (Lizaso-Belir Decl. ¶ 14.) Plaintiff claims that, contrary to allegations that her documentation was vague and insufficiently specific, "when [she] initially began [her] orientation, both [Aguilar] and [Lizaso-Belir] frequently told [her] that [she] wrote too much" and "emphasized and insisted that [she] use short hand when documenting the Patient's progress notes, to conform with the practice of other experienced Nurses on the Unit." (Jeffrey Decl. ¶ 46.)

Lizaso-Belir also completed successive performance reports throughout the month of March, each of which reflects that Plaintiff's documentation needed improvement. (Jeffrey Decl. ¶ 17; Aguilar Decl. ¶ 27; Def.'s 56.1 ¶¶ 178, 180-81.) Each week, Lizaso-Belir discussed the contents of these reports with Aguilar and Plaintiff. (Lizaso-Belir Decl. ¶¶ 19-21; Aguilar Decl. ¶ 28.)) Plaintiff claims that the negative comments in the reports were filled in after she was terminated. (Pl.'s 56.1 ¶¶ 174(a), 178(a), 180-81(a).)

Aguilar, too, "spoke with [Plaintiff] on several occasions regarding her documentation in an attempt to bring her documentation up to standards." (Aguilar Decl. ¶ 24; Jeffrey Tr. 236-

17

37.)[9]  According to Aguilar, Plaintiff was not receptive to Aguilar's critiques and "insisted that what [Aguilar] was telling her was incorrect."  (Aguilar Decl. ¶ 26.)  According to Plaintiff, Aguilar's approach to documentation differed from that which she had been taught during her first week of orientation and during her schooling.  (Jeffrey Tr. 232-33; 235.)  She claims that other RNs, whom Plaintiff could not name, agreed with Plaintiff that Aguilar's documentation methods were incorrect.  (Id. 237-39.)

On Plaintiff's next scheduled work day, March 24, 2009, Aguilar, who was preparing the schedule for the following month, called Plaintiff to her office.  (Jeffrey Decl. ¶ 39.)  Aguilar told Plaintiff that Lizaso-Belir "was not going to precept [Plaintiff] any longer, unless [Plaintiff] agreed to work the same schedule as [Lizaso-Belir]."  (Id.)  At this meeting, according to Plaintiff, Aguilar "also asserted that she was going to put [Plaintiff] on the [s]chedule on [her] observed Sabbath."  (Id.)  When Plaintiff "protested," Aguilar responded by stating that "she had enough of [Plaintiff] and [her] Sabbath" and that Plaintiff "could not orient on [Aguilar's] floor any longer."  (Id.)  Plaintiff also testified that around this time, Aguilar told her that "they want[ed] [Plaintiff] to go back on the schedule to work on Saturday, and [Plaintiff] refused." (Jeffrey Tr. 289.)

Following this meeting with Aguilar, Plaintiff "immediately contacted" Williamson who "was rude and reiterated that she was also sick and tired of [Plaintiff's] G------ Sabbath, and added . . . that if she knew that [Plaintiff] was a Seventh Day Adventist, she would not have hired [Plaintiff]."  (Jeffrey Decl. ¶ 40; Jeffrey Tr. 280.)  Williamson also "mumbled something about her foster parent forcing her to go to Seventh Day Adventist Church when she was young."

---

[9]    During one of these discussions, Aguilar told Plaintiff that "she needed to forget what she had learned as an LPN and should start thinking like an RN, because the documentation done by an RN is very different than that done by an LPN.  LPNs document observations and record what interventions have been done, whereas RNs are required to actually assess patients, document their assessments, and create a nursing plan of care for treatment of that patient."  (Aguilar Decl. ¶ 25.)

(Jeffrey Decl. ¶ 40.)   Williamson further stated that Plaintiff had "better be careful, because [Williamson] can go into the computer, at any time, and find reasons to fire [Plaintiff]."   (Id. ¶ 40.)

**The March 25, 2009 "Medication Issue" and its Aftermath**

In her declaration, Lizaso-Belir describes the following incident involving the administration of medication to a patient:

> On March 25, 2009, while reviewing the computer database, I noticed that Ms. Jeffrey had not administered a certain medication to one of her assigned patients during the scheduled time.  In reviewing the medication order, I realized that the dosage that had been prescribed appeared to be incorrect.  I spoke with Ms. Jeffrey and asked her why she had not administered the medication to the patient. She did not provide me with an explanation.  I then explained to Ms. Jeffrey that she needed to contact the prescribing physician and the pharmacy to confirm the prescription order, as the dosage appeared to be incorrect.  I also told her that she should not administer the medication to the patient until the order was confirmed. Ms. Jeffrey responded with hostility and refused to contact the prescribing physician/pharmacy.  I told Ms. Jeffrey that this was unsafe—she could kill the patient if she were to administer the medication as prescribed.  I also told her that I would no longer be her preceptor if she administered the medication to the patient.  She ultimately did not administer the medication to the patient as prescribed.

(Lizaso-Belir Decl.  ¶¶  23-28  (formatting altered);  Lizaso-Belir  Tr.  44-46.)   Lizaso-Belir documented what she described as the "medication issue" in Plaintiff's weekly report, noting that Plaintiff "showed resistance when asked pertinent questions regarding medication and insists on giving med." (Lizaso-Belir Decl. ¶ 31.)

Plaintiff offers an alternative account of the medication issue, explaining that, upon realizing that the prescribing doctor and the pharmacy had made a mistake, she "called the Doctor to alert him to the mistake" in accordance with hospital policy. (Jeffrey Decl. ¶ 44.)  The doctor and the pharmacy thereafter corrected the prescription and Plaintiff subsequently administered the correct prescription.  (Id.)  According to Plaintiff such delays "between the

scheduling and administering [of medication]" are "not atypical" at Montefiore.  (Id.)

Towards the end of Plaintiff's shift, she was called in Aguilar's office.  (Id. ¶ 41.)
"Without any warning or discussion, [Aguilar] began to berate [Plaintiff] for being stubborn
about her Sabbath demands, and falsely accused [Plaintiff] of giving the wrong medication to a
patient[] earlier in the day."  (Id.)  When Plaintiff "tried to inquire about [Aguilar's] concern,
[Aguilar] dismissed [her] and told [her] to punch out."  (Id. ¶ 42.)

***Events Leading to Plaintiff's Termination***

Due to the medication issue, Lizaso-Belir was "concerned that if Ms. Jeffrey were to pass
her orientation and proceed to work as an RN without direct oversight by a preceptor, she could
kill someone, as she did not use proper judgment and refused to listen to instructions."  (Lizaso-
Belir ¶¶ 32-33.)  Lizaso-Belir therefore advised Aguilar that she did not want to precept Plaintiff
because she was "unsafe," she "doesn't listen" and she "argues."  (Aguilar Tr. 71; Aguilar Decl.
¶ 29; Lizaso-Belir Decl. ¶ 32.)

Aguilar in turn spoke with ANM Doris Brown, informing her of the medication issue and
of Plaintiff's "poor documentation."  (Aguilar Decl. ¶ 30; Aguilar Tr. 25.)  Aguilar relayed
similar information to Williamson, who responded that she would "take care of it."  (Aguilar
Decl. ¶ 31; Williamson Decl. ¶¶ 53, 56; Aguilar Tr. 71.)

Williamson and Brown spoke regarding Plaintiff's reported performance issues,
"including her refusal to adhere to her preceptor's instructions and her problems with
documentation."  (Williamson Decl. ¶ 57; Williamson Tr. 165.)  According to Brown, "it was a
conversation . . . that [Plaintiff] is in the orientation phase and having a difficult time.  She's not
really meeting the goals of her orientation. . . . [I]t's best that we cut our losses now."  (Brown
Tr. 24.)  Williamson and Brown determined that Plaintiff's employment should be terminated.

(Williamson Decl. ¶ 57.)

***Plaintiff is Terminated***

On March 26, 2009, Plaintiff met with Yasin and Brown, whom Plaintiff had never met. (Jeffrey Decl. ¶ 42; Brown Tr. 45.)[10]   Brown told Plaintiff she was being terminated and asked her for her keys and identification card.  (Jeffrey Decl. ¶ 42.)  Brown described the meeting as follows:

> [Plaintiff] was called into my office.  I informed her that she would be terminated based on her clinical performance and the feedback that [I have] received from Ms. Aguilar . . . Pretty much that's—it was a short meeting that I recall.  I was there, again and there was some specific incidents with her documentation and clinical practice and as a result she would have to be let go.

(Brown Tr. 45.)  Brown testified that she never knew that Plaintiff had requested a religious accommodation.  (Id. 48.)

Plaintiff's testified that when she asked why she was being terminated, Yasin "volunteered that he had warned [Plaintiff] on many occasions to stop making an issue of [her] Sabbath, and to stop rocking the boat."  (Jeffrey Decl. ¶ 42; Jeffrey Tr. 277-279.)  Yasin disputes this account, testifying that he never even knew that the reason Williamson did not work on Saturday was because of her religion.  (Yasin Tr. 23.)

At no point during her tenure as an RN orientee was Jeffrey scheduled to work on a Saturday.  (Jeffrey Tr. 185, 285.)  In support of her claim, Plaintiff relies on the fact that Laryea, the other RN who oriented on Northwest 8 at the time, never requested an accommodation to not work on Saturday and never complained about having to work on a Saturday or Friday evening. (Def.'s 56.1 ¶ 129.)  Laryea continues to work at Montefiore, although there is no evidence in the record to suggest she had performance issues.  (Id. ¶ 128.)

---

[10]   Yasin was at the meeting as a "management witness."  (Yasin Tr. 54.)

## STANDARD OF REVIEW

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "A court reviewing a motion for summary judgment must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)).

Courts must not "weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only . . . determine whether there are issues to be tried."  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).  "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." Id.

### B.  Inconsistent Statements in Plaintiff's Declaration

While acknowledging the general standard set forth above, (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Mem.") at 10-11), Montefiore asserts that Plaintiff's Declaration, submitted in connection with her opposition brief, "should [be] disregarded."  (Defendant's Reply to Plaintiff's Counter Statement of Undisputed Material Facts

22

Pursuant to Local Rule 56.1 ("56.1 Reply") at 5).

Montefiore cites to the Second Circuit's opinion in Hayes v. N.Y.C. Dep't of Corr., 84

F.3d 614 (2d Cir. 1996), which made clear that notwithstanding the overarching principle that

courts should not weigh evidence at the summary judgment stage:

> a party may not create an issue of fact by submitting an affidavit in opposition to a
> summary judgment motion that, by omission or addition, contradicts the affiant's
> previous deposition testimony. . . . If a party who has been examined at length on
> deposition could raise an issue of fact simply by submitting an affidavit
> contradicting his own prior testimony, this would greatly diminish the utility of
> summary judgment as a procedure for screening out sham issues of fact. . . . Thus,
> factual issues created solely by an affidavit crafted to oppose a summary
> judgment motion are not "genuine" issues for trial.

Id. at 619 (citations and internal quotation marks omitted); see also Cleveland v. Policy Mgmt.

Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient

to survive summary judgment simply by contradicting his or her own previous sworn statement .

. . without explaining the contradiction or attempting to resolve the disparity.").

The Court finds the following averments, made by Plaintiff in opposition to Montefiore's

summary judgment motion, to be inconsistent with the cited testimony Plaintiff gave at her

deposition during discovery in this case:

- In Paragraph 23 of her Declaration, Plaintiff avers that "[a]fter learning that [she]
  passed the boards, [she] found out from a colleague in Unit Klau 4, that Ms.
  Williamson was trying to fill an RN position." She also avers in the same Paragraph
  that Butler "denied that there was any such opening."

  At her deposition, however, Plaintiff testified that, she spoke only to Williamson,
  Butler and an unnamed HR representative during her medical leave. (Jeffrey Tr. 121-
  122; 128; 136-37.) Plaintiff also testified at her deposition that, during the period of
  her leave, the topics she spoke to Butler about were limited to the fact that she
  "passed the NCLEX" and that she was "still out" and "wasn't cleared to come back to
  work yet." (Jeffrey Tr. 136-137.)

- Also in Paragraph 23 of her Declaration, Plaintiff avers that, during her conversation
  with Williamson during Plaintiff's medical leave, Williamson told her that she needed
  to go through HR "to seek such a promotional position, as [Williamson] would not

appoint [her], because of the unresolved Sabbath issue."

At her deposition, however, Plaintiff was explicitly asked what she discussed with Williamson during their conversation while Plaintiff was on medical leave. Plaintiff testified as follows: "Q. What did you discuss with Eva during this conversation? A. That I passed the NCLEX RN board. Q. Did you discuss anything else with Eva? A. And she said that I have to come back and have to come up to my old job and then apply before I could get the RN position." (Jeffrey Tr. 138; see also Williamson Tr. 125.)   Nowhere else in her deposition did Plaintiff state that Plaintiff made a comment during this conversation that Williamson would not appoint her because of her "unresolved Sabbath issue."

- In Paragraph 25 of her Declaration, Plaintiff avers that, during her January 5, 2009 with Williamson, "Williamson refused to allow [her] to work, unless [she] agreed to work on [her] Sabbath. I declined, and she sent me home. This resulted in a wage loss of one (1) week."

  As set forth in the background section above, however, Plaintiff testified in extensive detail about this event and specifically stated that, while Williamson initially stated she would be required to work on Saturday, the conversation concluded with the two agreeing that her accommodation request would be honored when Plaintiff put the request in writing and agreed to work on Sundays as needed. (Jeffrey Tr. 149-150; 165.)

- In Paragraphs 37 and 38 of her declaration, Plaintiff avers during a March 22, 2009 meeting, Lizaso-Belir asked her why she could not work on Fridays and Saturdays and Plaintiff explained. Plaintiff avers that Lizaso-Belir "responded by saying that's too bad[] because she is losing money as [Plaintiff's] preceptor" because, as Plaintiff's preceptor "she gets $2 an hour in extra pay." According to Plaintiff, for this reason, Lizaso-Belir decided not to precept Plaintiff beyond the end of March 2009, at which point she would take on a new group of RN orientees, "unless [Plaintiff] agreed to conform [her] schedule to [Lizaso's]."

  At her deposition, however, Plaintiff testified that she never discussed her schedule with Lizaso-Belir. (Jeffrey Tr. 251.)

The Court finds that inconsistencies exist between the above-referenced averments and corresponding deposition testimony, which inconsistencies Plaintiff has made no effort to reconcile or otherwise explain. Under Hayes, the Court thus declines to consider the inconsistent portions of Plaintiff's Declaration in adjudicating Montefiore's motion. See Davis v. Carroll, No. 09 Civ. 1088 (JPO), 2013 WL 1285272, at *40 n.25 (S.D.N.Y. Mar. 29, 2013) (excluding

from analysis statements that were inconsistent with facts from pre-motion record); Perkins v. Mem'l Sloane-Kettering Cancer Ctr., No. 02 Civ. 6493 (RJH), 2005 WL 2453078, *14-15 (S.D.N.Y. Sept. 30, 2005) (striking portions of affidavit contradicting deposition testimony); Golden v. Merrill Lynch & Co., Inc., No. 06 Civ. 2970 (RWS), 2007 WL 4299443, at *12 (S.D.N.Y. Dec. 6, 2007) ("[T]he portions of Golden's affidavit which conflict with her deposition will be disregarded."). The Court finds no basis, as Montefiore requests, however, to exclude from its consideration the entire contents of Plaintiff's Declaration, the bulk of the contents of which do not conflict with Plaintiff's deposition testimony.

## DISCUSSION

The above threshold determination notwithstanding, the Court finds that genuine issues of fact remain for trial. Specifically, as set forth below, while Montefiore is entitled to summary judgment as to Plaintiff's failure-to-accommodate claim, Plaintiff's disparate treatment and retaliation claims under Title VII and its state and local counterparts will proceed to trial.

### A. Religious Discrimination

It is unlawful under Title VII "for an employer . . . to discharge any individual or otherwise to discriminate against any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); see also Cosme v. Henderson, 287 F.3d 152, 157 (2d Cir. 2002) ("The broad aim of Title VII is to eliminate discrimination in employment, that is, employees who are similarly situated are not to be treated differently simply because they differ from one another with regard to their religious beliefs or practices.") A Title VII plaintiff "may claim a violation of religious discrimination . . . under theories of either denial of reasonable accommodation or disparate treatment." Goldschmidt v. N.Y.S. Affordable Hous. Corp., 380 F. Supp. 2d 303, 310 (S.D.N.Y. 2005) (Chin, J.) (citing Cosme, 287 F.3d 152 (denial of reasonable accommodation)

and Feingold v. New York, 366 F.3d 138 (2d Cir. 2004) (disparate treatment)).

Plaintiff asserts both failure-to-accommodate and disparate treatment claims against Montefiore.  The Court addresses each claim in turn.

**1.  Failure to Accommodate**

 "[W]hen an employee has a genuine religious practice that conflicts with a requirement of employment, his or her employer, once notified, must offer the aggrieved employee a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship."  Cosme, 287 F.3d at 158.  To make out a prima facie case of religious discrimination, therefore, an employee must show that (1) she held a bona fide religious belief conflicting with an employment requirement; (2) she informed her employers of this belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement.  Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001).  Assuming a plaintiff can establish her prima facie case, "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end."  Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986).

Plaintiff has established the first two prongs of her prima facie case.  There is no dispute that she holds a genuine religious belief that she refrain from work on her Sabbath.  Nor is there a dispute that this belief conflicted with both the 1199 CBA's policy allowing Montefiore to schedule beginner LPNs to work every Saturday and Montefiore's general policy that RN orientees work the same schedule as their assigned preceptors, which in Plaintiff's case would require Saturday work.  Further, there is no dispute that Butler and certain human resources representatives were informed of Plaintiff's need for religious accommodation from the outset of Plaintiff's employment and that Williamson was so informed as of July 2008.

26

The Court concludes, however, that Plaintiff cannot satisfy the third prong of her prima facie case, which requires a showing that she was disciplined for failing to comply with Montefiore's policy that LPNs and RNs sometimes perform Saturday work.  The clearest record support for this conclusion comes from Plaintiff's own deposition testimony:

> Q.   Now, while you were an LPN at Montefiore, did you ever work on a Saturday?
> A.   No.
> Q.   Were you ever disciplined for not working on a Saturday?
> A.   No.
>
> ***
>
> Q.   Now, were you ever disciplined for not working on Saturday, August 9th?
> A.   No.
>
> ***
>
> Q.   You were never disciplined for not working on Saturdays during this time, correct?
> A.   No.

(Jeffrey Tr. 62; 87; 191-92.)  These unequivocal admissions belie any effort Plaintiff now makes to salvage her failure-to-accommodate claim.  See Marmulszteyn v. Napolitano, 2013 WL 3021144, at *1 (2d Cir. June 19, 2013) (affirming dismissal of failure-to-accommodate claim where employee testified that he had not been disciplined "for not showing up on Saturday"); Durant v. Nynex, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) ("Durant has not established a prima facie case of religious discrimination because she was never disciplined for her failure to work on the Sabbath."); see also Lewis v. City of Buffalo Police Dep't, 311 F. App'x 417, 420 (2d Cir. 2009) ("Lewis's concession that, '[i]n terms of the rotation, I suppose I was treated as everyone in the platoon,' Lewis Dep. at 280, is fatal to this part of her disparate treatment claim.").

Even assuming Plaintiff had established a prima facie case, and although Plaintiff was

scheduled to work two Saturdays, the evidence shows that Montefiore reasonably accommodated Plaintiff by permitting her to work every Sunday she was needed rather than working both weekend days twice a month, as it required of other LPNs.  When Plaintiff became an RN and it was determined that tracking Lizaso-Belir's schedule would require Saturday work, Aguilar rewrote Plaintiff's schedule so she was not assigned to work on Saturdays and Plaintiff was assigned a second preceptor during Lizaso-Belir's day off.

Montefiore's accommodations are well within the range of those that courts have deemed reasonable.   See, e.g., Marmulszteyn, 2013 WL 3021144, at *1 (employer "eliminated Marmulszteyn's religious conflict because, when he was assigned a Saturday morning shift, he was allowed to switch to a Saturday shift beginning at 10:00 p.m., after his Sabbath ends."); Ansonia, 479 U.S. at 70 ("[R]equiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one.").  Plaintiff has all but conceded as much, having emphasized that she "happily" worked any Sunday she was needed.  (Jeffrey Decl. ¶ 7.)

To be sure, Plaintiff's version of the events speaks of her supervisors' at times aggressive resistance to her accommodation requests—e.g., Butler's and Yasin's alleged attempts to "reprimand" and "discipline" her in August 2008, Williamson's January 2009 alleged tirade and Aguilar's alleged demand that Plaintiff work with Lizaso-Belir on Saturdays.  But such evidence has been held insufficient to salvage claims brought by plaintiffs who were ultimately accommodated.  See Chukwueze v. NYCERS, 891 F. Supp. 2d 443, 453-54 (S.D.N.Y. 2012) ("Chukwueze argues first that he was denied a reasonable accommodation with respect to his December 2008 leave request because he was initially denied leave and because his requests were met with hostility and severe opposition.  By his own admission, however, he was

ultimately allowed his requested accommodation, namely to be allowed to use his annual leave

to take the day off.  Thus, even assuming that Chukwueze could establish a prima facie case of

discrimination on this basis, his claim that Defendant failed to accommodate his religious

observance is implausible and fails.") (internal citations and punctuation omitted); <u>Garvin v.</u>

<u>Potter</u>, 367 F. Supp. 2d 548, 566 (S.D.N.Y. 2005) ("Here, the plaintiff was not required to work

on Saturdays or Jewish holidays, and the plaintiff provides no evidence of any disciplinary

measure taken against him that was related to the plaintiff's failure to work on Saturdays or

Jewish holidays. Therefore, the plaintiff has not established a prima facie case that the defendant

failed to accommodate his religious beliefs in violation of Title VII.")

"[T]he statutory inquiry is," accordingly, "at an end."   <u>Ansonia</u>, 479 U.S. at 68.

Plaintiff's failure-to-accommodate claim is dismissed.

## 2.  Disparate Treatment[11]

Plaintiff's disparate treatment claim is governed by the familiar burden-shifting

framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).  Under

that framework, a plaintiff must first establish a prima facie case of discrimination by showing

that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3)

she suffered an adverse employment action; and (4) the adverse action took place under

circumstances that give rise to an inference of discrimination.  <u>Ruiz v. Cnty. of Rockland</u>, 609

F.3d 486, 491-92 (2d Cir. 2010).  The plaintiff's burden in establishing a prima facie case is "de

minimis."  <u>Zimmermann v. Associates First Capital Corp.</u>, 251 F.3d 376, 380-81 (2d Cir. 2001).

---

[11]    For the first time in her opposition brief, Plaintiff argues that she was also subjected to a hostile work environment.  The Second Circuit has recently noted its refusal "to address the merits of claims raised for the first time at [the summary judgment stage] of the litigation." <u>Rojo v. Deutsche Bank</u>, 487 F. App'x 586, 588-89 (2d Cir. 2012); <u>see also Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy</u>, 449 F. App'x 57, 59 (2d Cir. 2011) (deeming unpreserved an unjust enrichment claim raised "for the first time in a summary judgment motion, not in the complaint").  The Court therefore rejects Plaintiff's belated attempt to add a claim without seeking leave, after the time to do so has expired, after discovery has closed and after Defendant has moved for summary judgment.

"Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination." Ruiz, 609 F.3d at 492. "In other words, 'the defendant must clearly set forth . . . reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" Desir v. City of New York, 453 F. App'x 30, 34 (2d Cir. 2011) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)) (internal punctuation and emphasis omitted).

If the defendant does so, "the plaintiff is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is a pretext for an impermissible motivation." Howley v. Twn. of Stratford, 217 F.3d 141, 150 (2d Cir. 2000). At the summary judgment stage, a court should examine the record as a whole to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. Id. at 151.

### a. Prima Facie Case

Plaintiff has satisfied the first two prongs of her prima facie case, as Montefiore apparently concedes. (Mem. 17.) As to the first prong, she is a Seventh-day Adventist and therefore a member of a protected class. As to the second prong, evidence reflects that she was qualified for the LPN position. (Butler Tr. 39 ("Q: And her performance was satisfactory is that correct?  A: Yes.")) Plaintiff was qualified for the RN position because she passed the NCLEX. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.").

Montefiore does dispute, however, that Plaintiff can establish the third and fourth

elements of her prima facie case—i.e. that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  It is to these elements that the Court now turns.

### *Adverse Employment Action*

"An adverse employment action is a materially adverse change in the terms and conditions of employment." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks omitted).  "Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).  No matter the situation, however, change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be materially adverse.  Galabya, 202 F.3d at 640.

Plaintiff asserts she was subjected to several adverse actions, pointing to Montefiore's alleged:

> [1] [s]cheduling [her] to work on days she could not, on account of her belief, and [2] docking her pay for exercising such faith, [3] assigning her less meaningful tasks, [4] harassing her, [5] delaying her promotion, and [6] her eventual discriminatory termination in March 2009[.]

(Pl.'s Opp'n 20.)  The Court agrees with Plaintiff that, when evaluating adverse materiality, "context matters, as some actions may take on more or less significance depending on the context."  (Id. at 23 (citing Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011).).  Having evaluated each of the actions Plaintiff contends are materially adverse

in context, however, the Court finds that none, save for Plaintiff's termination, was materially adverse.

*First*, the fact that Montefiore scheduled Plaintiff to work on two Saturdays (August 9, 2008 and August 23, 2008), presented at most "a mere inconvenience" given that Plaintiff undisputedly did not ultimately work those days.

*Second*, Plaintiff's related argument that she was "dock[ed]" pay for failing to work on Saturdays she was scheduled rests on the premise that LPNs, who are apparently paid by the hour, (Def.'s 56.1 ¶ 24), are entitled to pay for time they have not worked.  That premise finds no support in the record, nor is there any evidence that Plaintiff was unable to make up those hours another day.  Therefore, even if in some cases docking an employee's pay may be considered a materially adverse action, see Whitright v. Hartford Pub. Sch., 547 F. Supp. 2d 171, 181 (D. Conn. 2008), this is not one of them.

*Third*, Plaintiff's assertion that she was assigned "less meaningful tasks"—presumably referring to her August 10, 2008 "float" assignments, which allegedly amounted to the "work of a Nurse's Aide"—is precisely the sort of "mere inconvenience or an alteration of job responsibilities" that cannot constitute an adverse action.  In any event, Plaintiff conceded that her pay and hours remained the same on August 10, and admitted that the purported "less meaningful tasks" (e.g., lifting heavy patients and doing "fingersticks," "vent[s]" and "trach[s]") were actually no different than the work LPNs normally do, leaving the Court with no "objective indicia of material disadvantage," but only Plaintiff's subjective complaints about her assignment on that day.  Beyer, 524 F.3d at 164 ("[S]ubjective, personal disappointment is not enough.") (internal punctuation omitted).

*Fourth*, general "harassing" is not an adverse employment action.  See Quarless v.

Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 385-86 (S.D.N.Y. 2002).   The comments Plaintiff avers to that could be characterized as harsh, rude or distressing—e.g., Williamson's "vicious" remarks or Yasin's repeated references to "rocking the boat"—are "hardly even actions, let alone adverse actions."  Scott v. City of N.Y. Dep't of Corr., 641 F.Supp.2d 211, 231 (S.D.N.Y. 2009); see also Pappas v. N.Y. Bd. of Educ., No. 07-cv-4312 (FB)(MDG), 2011 WL 128509, at *3 n.3 (E.D.N.Y. Jan. 14, 2011) (Being yelled at by supervisors is not an adverse employment action.).  Although, as discussed below, these comments, with others, serve to create a factual issue as to whether Plaintiff's termination was motivated by discriminatory animus, they do not constitute independent adverse actions.

*Fifth* and finally, even if there was record evidence permitting an inference that Plaintiff should have been promoted in January 2009 rather than March 2009, it is a *failure* to promote, not a failure to *quickly* promote that makes an employment action materially adverse.  Galabya, 202 F.3d at 640 (delay in reassignment did not constitute an adverse employment action); Davis v. City Univ. of N.Y., No. 94 Civ. 7277 (SHS), 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996) ("The eventual grant of tenure and a promotion to Davis, even if after a delay, and even if that delay were due to discrimination or retaliation, contradicts her claim that she suffered a materially adverse change.").

Plaintiff's March 2009 termination, however, clearly qualifies as a materially adverse action, Williams, 368 F.3d at 128, and it is on this action alone that Plaintiff's claims may proceed.

33

*Inference of Discrimination*

The Court's analysis of the final prong of the Plaintiff's prima facie case turns therefore on whether Plaintiff can show that her termination occurred under circumstances giving rise to an inference of discrimination.  Ruiz, 609 F.3d at 491-92.

Construing the facts in Plaintiff's favor, as the Court must, the Court finds such evidence in the comment Yasin allegedly volunteered during the very meeting at which Plaintiff was terminated—i.e., that "he had warned [Plaintiff] on many occasions to stop making an issue of [her] Sabbath, and to stop rocking the boat."  (Jeffrey Decl. ¶ 42.)  Surely this comment is sufficient to establish Plaintiff's "de minimis" burden at this preliminary stage.

As is often noted, the final prong of this prima facie stage "tend[s] to collapse as a practical matter under the McDonnell Douglas framework" with the pretext stage.  Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 n.1 (2d Cir. 2002); see also D'Agostino v. L.A. Fitness Int'l, LLC, 901 F. Supp. 2d 413, 422 n.4 (E.D.N.Y. 2012) ("The court notes that many of the parties' arguments regarding pretext could apply with equal force to the fourth prong of the prima facie case, i.e., whether Plaintiff has demonstrated that her demotion occurred under circumstances giving rise to an inference of discrimination. However, given this nebulous standard and the de minimis burden placed on a plaintiff to establish a prima facie case, it is more appropriate to assume that Plaintiff has established her prima facie case and address these arguments in its discussion of pretext below.") (internal quotation marks omitted).  The Court therefore finds it appropriate to address the additional evidence regarding discrimination in its discussion of pretext below.[12]

---

[12]     The Court rejects Defendant's contention that the final prong of Plaintiff's prima facie case cannot be met because Plaintiff has not demonstrated that a "similarly situated non-Seventh Day Adventist probationary RN, who was considered 'unsafe' by their preceptor and whose documentation was deemed poor, was not also fired."  (Def.'s Reply 7.)  Although one common way to satisfy the fourth prong is to "demonstrat[e] that similarly situated

### b.  Legitimate Non-Discriminatory Reason

Plaintiff having satisfied her prima facie case, it becomes Montefiore's burden to set forth reasons for its termination decision that, if believed, would support a finding that discrimination was not the cause of Plaintiff's employment action.  Montefiore asserts a series of legitimate, non-discriminatory reasons for Plaintiff's termination.

For example, Lizaso-Belir found Plaintiff's handling of the aforementioned "medication issue" to be "unsafe," fearing that Plaintiff "could kill the patient if she were to administer the medication as prescribed."  Lizaso-Belir's criticism of Plaintiff on this issue was met with "hostility."  Separately, Lizaso-Belir and Aguilar believed Plaintiff's documentation, essential to the RN role, to be inadequate and claim that it failed to improve despite repeated instruction and extensive guidance.  When confronted, Plaintiff again allegedly challenged Aguilar's authority.

Similar reasons have been deemed satisfactory at this stage.  See, e.g., Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985) (defendant articulated a nondiscriminatory reason for terminating plaintiff when defendant presented evidence that plaintiff s job performance "did not measure up to that required of [her position]"); Young v. Benjamin Dev. Co., Inc., No. 03 Civ. 10209 (RJS), 2009 WL 498933, at *9 (S.D.N.Y. Feb. 17, 2009) (finding employer proffered a legitimate nondiscriminatory reason for terminating plaintiff when, even after a warning, plaintiff refused to complete tasks that were assigned to him); Ponniah Das v. Our Lady of

---

employees . . . were treated more favorably," Staff v. Pall Corp., 233 F. Supp. 2d 516, 535 (S.D.N.Y. 2002), aff'd, 76 F. App'x 366 (2d Cir. 2003), "[t]here is no rigid rule for determining whether a plaintiff has demonstrated circumstances giving rise to an inference of discrimination."  Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91 (2d Cir. 1996); see also Abdallah v. Napolitano, 909 F. Supp. 2d 196, 206 (W.D.N.Y. 2012) ("[W]hile identification of a similarly situated comparator who was accorded more favorable treatment may be the preferred route toward an inference of discrimination for the purpose of establishing a prima facie case of disparate treatment, it is not the only route.").  In any event, even if Plaintiff could only satisfy the fourth prong by comparing herself to a similarly-situated employee, the proper standard requires that plaintiff "show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  The standard does not, as Defendant's hypothetical scenario seems to suggest, require that the employee be "identically situated."  Chukwuka v. City of New York, No. 08 Civ. 2095 (RJD) (LB), 2010 WL 3780214, at *6 (E.D.N.Y. Sept. 21, 2010).

Mercy Med. Ctr., No. 00 Civ. 2574, 2002 WL 826877 (JSM), at *9 (S.D.N.Y. Apr. 30, 2002) ("Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment.").

Plaintiff makes no effort to contest—and, in any event, the Court readily finds—that Montefiore has met its burden under McDonnell Douglas.

### c. Pretext

To survive summary judgment, Plaintiff must "come forward with evidence that the defendant's proffered non-discriminatory reason is a mere pretext for actual discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). To establish pretext, she "must produce not simply 'some' evidence, but sufficient evidence to support a rational finding that the . . . reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Id. (internal quotation marks and alterations omitted).

The record is replete with evidence, albeit evidence sourced primarily from Plaintiff's own deposition testimony and Declaration, from which a jury could find that standard met. For example, Plaintiff has averred that:

- Williamson told Plaintiff she "ha[d] to" work every other weekend, including Saturdays, and that she would "be fired" if she did not because "there are other people in [Montefiore] that are Seven Day Adventist [sic] that she don't [sic] give the days and they are working, and [Plaintiff] cannot just come and get the day off."

- Yasin was "very upset" about the letter from Plaintiff's church pastor and commented that "some pastor sen[t] a letter" and made it clear that he believed Plaintiff was "lying" and "deceiving" because she "did not tell anyone about the Sabbath." Following those comments Yasin scheduled Plaintiff to work on Saturday, August 9, 2008.

- Yasin scheduled a meeting following Plaintiff's August 9, 2008 absence to "discipline" her as evidenced by an email to HR alluding to "the consequences" of Plaintiff's failure to work on that Saturday.

36

- Butler called Plaintiff on Monday, August 11, 2008 to "reprimand" her for "not showing up to work on Sabbath."

- Plaintiff was given an "extremely hard" assignment following the Saturday she failed to attend work as scheduled.

- Williamson referred, on multiple occasions, to Plaintiff's "God damn Sabbath" in connection with comments that she would "find something" on Plaintiff and "F [Plaintiff] up."

- When Plaintiff "begged" Yasin not to assign her to Aguilar during her RN orientation, Yasin responded by telling Plaintiff that he was "going to keep an eye on [her] during [her] orientation" and that she had "better stop rocking the boat, or [she could] be terminated at will[] during her RN Probationary Period with no questions asked."

- Laryea, the other RN who oriented on Northwest 8 at the same time as Plaintiff, never requested an accommodation to not work on Saturday and never complained about having to work on a Saturday or Friday evening.  Laryea continues to work at Montefiore.

It is true that Plaintiff's proffered evidence consists almost exclusively of her own testimony, which with few exceptions lacks any independent corroboration.  It is also true that, at trial, that testimony will be countered by the testimony of numerous defense witnesses and by cross-examination that will no doubt exploit the numerous inconsistencies in Plaintiff's sworn testimony that the Court listed above.

Nonetheless, viewed in its totality, the foregoing evidence is "sufficient . . . to support a rational finding that the legitimate nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]."  Weinstock, 224 F.3d at 42 (internal quotation marks omitted).  Courts have found triable issues in records containing substantially less evidence of discriminatory animus.  See, e.g., Goldschmidt, 380 F. Supp. 2d at 316 (factual issue existed where there was "little doubt that defendants were unhappy with plaintiff's schedule, admonishing the imposition it created").

37

Plaintiff's claim survives at this stage because this "a classic 'he said, she said' situation that is not amenable to summary judgment."  Simpri v. City of New York, No. 00 Civ. 6712 (SAS), 2003 WL 23095554, at *7 (S.D.N.Y. Dec. 30, 2003).

## B.  **Retaliation**

Title VII also prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  As with discrimination claims, "Title VII retaliation claims follow the three-part burden-shifting analysis set out in McDonnell Douglas."  Rojas, 660 F.3d at 107.  As modified for such claims, the framework is structured as follows:

> First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. The plaintiff's burden in this regard is de minimis and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. If the plaintiff sustains this initial burden, a presumption of retaliation arises.  The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action. If so, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.

Id. (quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)).

### 1.  **Prima Facie Case**

Plaintiff has met the first three prongs of her prima facie retaliation case.  Her repeated discussions with her supervisors in March 2009 regarding her need for religious accommodation suffice to establish her participation in a protected activity and Montefiore's knowledge of it.  Jenkins v. N.Y.C. Transit Auth., 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) ("[P]laintiff sufficiently alleged that she engaged in a protected activity" where she "asked the [defendant] to

accommodate her religious beliefs" because "a claim for retaliation can be based upon a request for reasonable accommodation.") (citing Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 149 (2d Cir. 2002) (request for disability accommodation constitutes protected activity)); Gordon v. N.Y. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.")  Plaintiff's termination, of course, constitutes an adverse action.

As to the final prong, the temporal proximity between Plaintiff's alleged late-March 2009 protestations to Aguilar and Williamson and Plaintiff's ultimate termination on March 26, 2009 is sufficient at the prima facie stage to establish the requisite causal connection.  Karimian v. Time Equities, Inc., No. 10 Civ. 3773 (AKH), 2013 WL 2254557, at *2 (S.D.N.Y. May 22, 2013) ("Temporal proximity may be used as evidence of causation to support a prima facie claim of retaliation."); see also Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (recognizing that a prima facie case of retaliation based on mere temporal proximity requires that this proximity be very close).[13]

---

[13]    The Court rejects the two primary arguments that Montefiore asserts defeat Plaintiff's retaliation claim. Montefiore first argues that Plaintiff could not have suffered retaliation because Plaintiff's "termination was based on Ms. Lizaso-Belir's negative evaluation and criticism of Plaintiffs performance" and "it is undisputed that Ms. Lizaso-Belir had no knowledge of Plaintiff's religion or alleged protected activity."  (Mem. 22.)  The relevant question, however, is whether the supervisor that decided to terminate Plaintiff—here, Williamson (with others)—knew of the protected activity, not whether the employee who supplied the supervisor with an ostensible pretext for retaliatory action knew of that activity.

Montefiore also argues that "Plaintiff's hiring as a[n] RN by Ms. Williamson in February 2009 negates any inference of retaliatory animus, because Ms. Williamson was fully aware of Plaintiff's religion, religious accommodation request, and alleged protected activity at the time of her hire as a[n] RN."  (Mem. 22-23.)  It is true that in some circumstances in which the same supervisor who fired a plaintiff also hired her, "it is difficult to impute to [the supervisor] an invidious motivation that would be inconsistent with the decision to hire."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000).  That proposition, however, cannot mandate a finding of summary judgment where, as here, subsequent to the decision to hire, the decision maker made statements suggestive of retaliatory animus immediately before the ultimate termination decision.

**2. Legitimate Non-Retaliatory Reason**

For the reasons expressed above, the Court finds that Montefiore has articulated several legitimate reasons for Plaintiff's termination.

**3. Pretext**

Ultimately, however, the Court finds that a reasonable jury could reject those reasons in favor of the following version of events to which Plaintiff has averred—i.e., that:

> on March 24, 2009, when Aguilar informed her she would schedule her on forthcoming Saturdays, Plaintiff "protested" to Aguilar who responded that "she had enough of [Plaintiff] and [her] Sabbath." Shortly thereafter, Plaintiff brought the issue to Williamson who "reiterated that she was also sick and tired of [Plaintiff's] G------ Sabbath" and told Plaintiff she had "better be careful, because [she] can go into the computer, at any time, and find reasons to fire [Plaintiff]." Williamson, with others made the decision to fire Plaintiff shortly thereafter, and Plaintiff was terminated on March 26, 2009.

Although Montefiore of course disputes the foregoing testimony, a jury could credit it and conclude that Plaintiff was terminated by Montefiore because she voiced a need for religious accommodation. Because the Court is not permitted to make credibility assessments at this stage, Rem, 38 F.3d at 644, summary judgment on Plaintiff's retaliation claim is inappropriate.

**C. NYSHRL and NYCHRL Claims**

The same substantive standards apply to claims of employment discrimination and retaliation under Title VII and the NYSHRL. Joseph v. Marco Polo Network, Inc., No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *7 (S.D.N.Y. Nov. 10, 2010) (discrimination); Shih v. JPMorgan Chase Bank, N.A., No. 10 Civ. 9020 (JGK), 2013 WL 842716 (S.D.N.Y. Mar. 7, 2013) (retaliation). Accordingly, the foregoing analysis applies with equal force to Plaintiff's claims under the NYSHRL.

The Second Circuit has recently (and repeatedly) cautioned, however, that district courts must analyze "discrimination and retaliation claims under the NYCHRL 'separately and

independently from any federal and state law claims,' and construe the NYCHRL 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" Aiossa v. Bank of Am., N.A., 2013 WL 4733930, at *1 (2d Cir. Sept. 4, 2013) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)).

The Court has separately considered Plaintiff's NYCHRL claims and ultimately reaches the same conclusions it has reached with respect to her Title VII and NYSHRL claims. Plaintiff's failure-to-accommodate claim cannot survive even under the more liberal NYCHRL standard in light of Plaintiff's unequivocal acknowledgment that she was not disciplined for not working on the Sabbath and, separately, in light of Montefiore's reasonable accommodation, which Plaintiff "happily" accepted.  See Lytle v. JPMorgan Chase, No. 08 Civ. 9503 (DAB) (JLC), 2012 WL 393008, at *29. (S.D.N.Y. Feb. 8, 2012).  And, logically, to the extent the Court has denied summary judgment as to Plaintiff's Title VII and NYSHRL disparate treatment and retaliation claims, summary judgment must also be denied as to her similar NYCHRL claims.[14]

---

[14]      The Court does not find that, even under the NYCHRL's broader definition of adverse action, see Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc., 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) (citing Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 37-38 (1st Dep't 2009)), Plaintiff suffered adverse actions beyond her ultimate termination.

## CONCLUSION

Montefiore's motion for summary judgment is granted as to Plaintiff's failure-to-accommodate claim and is otherwise denied. The Clerk of Court is respectfully directed to close item number nineteen (19) on the docket of this case. A status conference in this matter is scheduled for October 4, 2013 at 2:45 p.m. The parties shall jointly call Courtroom Deputy Allison Cavale at (212) 805-0162 that time. In advance of the call, the parties shall confer as to how they propose to proceed.

SO ORDERED.

Dated:        September 27, 2013
              New York, New York

                                        _____
                                        Ronnie Abrams
                                        United States District Judge

42